## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

MICHELLE VASARELY,

    *Petitioner*,

v.

UNITED STATES OF AMERICA,

    *Respondent*.

Civil No. 23-mc-00256 (MAJ)

## OPINION AND ORDER

### I.    Introduction

This matter is the culmination of a family feud in France spanning decades. At stake is how the works of famous Hungarian artist Victor Vasarely ("Master Vasarely") are to be distributed amongst the heirs and beneficiaries of his estate. (**ECF No. 1**). The petitioner, Michele Vasarely ("Mrs. Vasarely") is a collector of fine art and the daughter-in-law of Master Vasarely. (**ECF No. 1 at 3**); (**ECF No. 143 at 2**).

On April 11, 2023, the FBI raided the home of Mrs. Vasarely, seizing 112 works of art and various items of electronic property from her residence in San Juan, Puerto Rico. (**ECF No. 16 at 9**). According to the affidavit filed in support of the application for the search warrant ("Affidavit"), the order was "necessary to execute a request" from the Government of France "for assistance in the investigation or prosecution" of criminal charges filed against Mrs. Vasarely. *See* 18 U.S.C. § 3512. The Affidavit alleged that Mrs.

Vasarely is currently facing pending criminal charges in France for "breach of trust, concealment of breach of trust, and laundering[.]" (**ECF No. 4 at 6–7 p. 13**).[1]

Mrs. Vasarely contends that the search of her residence and seizure of her property were unlawful. On May 9, 2023, Mrs. Vasarely moved the Court under Federal Rule of Criminal Procedure 41(g) for return of her seized property. (**ECF No. 1**). The Court held a hearing in February 2024 to receive evidence addressing the Court's jurisdiction. (**ECF No. 104**); (**ECF No. 108**). During the hearing, Mrs. Vasarely called three witnesses. (**ECF No. 104**); (**ECF No. 108**). The Government called one witness. (**ECF No. 108**). Closing arguments were heard on June 26, 2024, after which the parties submitted their post-hearing briefs. (**ECF Nos. 143, 144, 147, 148**). For the reasons stated hereafter, the Court **DENIES** Mrs. Vasarely's request.[2]

## II.    Factual Background

Mrs. Vasarely was born in France in 1941. (**ECF No. 105 at 30:20**). At twenty-two years of age, Mrs. Vasarely met the artist Jean-Pierre ("Yvaral") Vasarely, the son of Master Vasarely. *Id*. at 31:4, 34:8–9. The couple married in 1969. *Id*. Mrs. Vasarely quickly developed a close relationship with her father-in-law, Master Vasarely. *Id* at

---

[1]    On May 2, 2025, Mrs. Vasarely filed an informative motion updating the Court on the criminal proceedings underway in France. (**ECF No. 149**); *see also* (**ECF No. 170**). According to the motion, in April 2025 the French Court of Cassation quashed the "interrogatoire de première comparution" filed against Mrs. Vasarely. *Id*.; (**ECF No. 154 at 3**). Although the parties disagree about the implications of this decision, Mrs. Vasarely never claims that the ruling represents an end to the criminal proceedings brought against her in France. (**ECF No. 154**). Instead, she acknowledges that a warrant for her arrest remains outstanding in France. (**ECF No. 154 at 3**). Moreover, Mrs. Vasarely does not make any argument that U.S. law conditions the transfer of evidence between sovereign nations on the existence of a pending Indictment or any similar proceeding. Rather, the law is clear that such transfers of evidence may be undertaken to assist a foreign sovereign in "the investigation *or* prosecution of criminal offenses." 18 U.S.C. § 3512 (emphasis added). The Court therefore finds that the April 2025 decision from the French Court of Cassation has no bearing on this case.

[2]    In making this determination, the Court considers Mrs. Vasarely's Motion (**ECF No. 1**), the Government's Response (**ECF No. 16**), the Reply (**ECF No. 23**), and the Government's Sur-Reply (**ECF No. 39**), testimonies presented during the evidentiary hearing, in addition to the parties' post-hearing briefs and respective responses (**ECF Nos. 143, 144, 147, 148**), as well as the entirety of the record.

36:8−9. In a matter of several years, Mrs. Vasarely had quit her job and began working full-time as an assistant/agent to Master Vasarely and Yvaral. *Id.* at 36:23−24. This work would become the enduring dedication of Mrs. Vasarely's life. *Id.* at 40:12. She continued to work as an assistant/agent to Master Vasarely until his death in 1997. *Id.* at 40:12−13. During this time, Mrs. Vasarely did not always receive a salary. (**ECF No. 105 at 43**). Instead, Master Vasarely paid Mrs. Vasarely for her work with his paintings. *Id.* at 43−44.

Master Vasarely's wife, Claire Spinner, died in 1990, leaving a set of Vasarely artworks to the Vasarely Foundation (the "Foundation") in her will.[3] (**ECF No. 1 at 11−12**).[4] Shortly thereafter, in 1991, Mrs. Vasarely was appointed to an administrative role at the Vasarely Foundation (the "Foundation"). *Id.* Mrs. Vasarely continued to serve in positions of leadership at the Foundation until 1997. *Id.*

During the time that Mrs. Vasarely was Chairperson of the Board of Directors of the Foundation,[5] a legal dispute over the donated artwork arose between the heirs to Claire Spinner's estate and the Foundation. (**ECF No. 1 at 11**); (**ECF No. 4 at 12 ¶ 29**). Invoking a rule of French probate law, the heirs to Claire Spinner's estate sought to revert the artworks which had been devised to the Foundation by Spinner. *Id.* at 11−12. Arbitration proceedings between the Foundation and the family were held in 1993. *Id.* at 12. Shortly thereafter, in 1995, an arbitral award was issued in favor of the family. *Id.* To

---

[3]    The Vasarely Foundation was established in 1966 by Master Vasarely.

[4]    For the purposes of providing a detailed background regarding the events that preceded this petition, the Court refers to some of the allegations set forth in Mrs. Vasarely's filings. These allegations are not evidence and, in ruling on the instant petition, the Court does not rely on such information.

[5]    Mrs. Vasarely asserts in her petition that she became a member of the "administrative council" of the Foundation in 1991 and that she was named the President of the Foundation in 1995. (**ECF No. 1 at 11−12**). Because these distinctions are immaterial to this Opinion and Order, for the sake of clarity the Court refers to Mrs. Vasarely as a "Chairperson of the Board of Directors" during the time of the events in question.

satisfy its obligations under the award, the Foundation conveyed a set of paintings to the family, including pieces which were apportioned to Mrs. Vasarely as reimbursement for services she had performed for the family. *Id.*

Master Vasarely died in 1997. *Id.* at 13. A portion of his estate passed to Yvaral, who in turn died in 2002. *Id.* Mrs. Vasarely was an heir to Yvaral Vasarely's estate, along with his son Pierre Vasarely. *Id.* Thus, in addition to the collection of original works she already possessed, upon her husband's death, Mrs. Vasarely received a significant number of the Master Vasarely paintings that were apportioned to the family pursuant to the 1995 arbitral award. (**ECF No. 105 at 43−44**). According to the federal agents that searched her San Juan home on April 11, 2023 and recovered 112 pieces of Vasarely artwork, this was only a portion of the artworks Mrs. Vasarely possessed. (**ECF No. 18-1**); (**ECF No. 16 at 9, 13**). Following the death of Yvaral in 2002, Mrs. Vasarely moved to the United States. (**ECF No. 1 at 14**).

Since 1995, Mrs. Vasarely has been involved in a series of disputes concerning the Vasarely artworks. In 2008, the Foundation filed a claim against Mrs. Vasarely in which it sought restitution of the artworks Mrs. Vasarely received pursuant to the 1995 arbitral award. (**ECF No. 1 at 13**). Between 2008 and 2009, she was involved in two civil lawsuits in the United States that raised competing claims of ownership over various Vasarely artworks. (**ECF No. 1 at 15**). Ms. Vasarely prevailed in each of those civil lawsuits.

In 2009, the French authorities initiated a criminal investigation against Mrs. Vasarely. (**ECF No. 1 at 14**); (**ECF No. 4 at 6−7 ¶ 13**). The French authorities sought to uncover evidence that Mrs. Vasarely had committed the offenses of breach of trust, concealment of breach of trust, and money laundering in connection with the 1995 arbitral award. (**ECF No. 4 at 6−7 ¶ 13**). Specifically,  French criminal proceedings were

initiated to investigate Mrs. Vasarely for allegedly abusing her position as Chairperson of the Board of Directors of the Vasarely Foundation between 1995 and 1997 by misappropriating Vasarely artworks for her personal benefit. (**ECF No. 4 at 12 ¶ 29**); (**ECF No. 16 at 19, 30**). French authorities maintain that Mrs. Vasarely, as Chairperson of the Board of Directors of the Vasarely Foundation, organized, with the help of third-party accomplices, a sham arbitration for the benefit of herself and other Vasarely heirs, to the detriment of the Foundation that she was charged to protect. (**ECF No. 4 at 12 ¶¶ 29–31**). In 2014, a French court ruled that the 1995 arbitral award was the product of a conflict-of-interest and declared the award invalid. (**ECF No. 1 at 15–16**).

### The Mutual Legal Assistance Treaty Request

On March 10, 2023, the government of France transmitted a formal request to the United States for assistance in the investigation of Mrs. Vasarely, pursuant to a treaty between the two nations. (**ECF No. 4 at 8 ¶ 17**); (**ECF No. 4 at 39**). As the Court will explain in further detail below, a Mutual Legal Assistance Treaty ("MLAT") is a legally binding treaty between sovereign nations to cooperate in the investigation and prosecution of transnational crimes. Pursuant to the MLAT adopted between France and the United States, the French government requested "the competent judicial authorities of the United States of America" to seize certain artworks and "any document, including digital versions, attesting to the origin of the works, their ownership, authenticity or market value." (**ECF No. 4 at 53–54**). It also requested that the United States "take all measures to guarantee a good conservation of the seized works and allow their transfer as elements of evidence to the requesting authority." *Id.* Finally, it sought authorization for the "requesting [French] magistrates, a specialized assistant, the court clerk

responsible for the case and a legal expert" to participate in the investigation. (**ECF No. 4 at 54**).

In accordance with the request, and pursuant to a search warrant duly issued by a Magistrate Judge in the District of Puerto Rico, the FBI seized 112 pieces of artwork and electronic property on April 11, 2023. (**ECF No. 1**); (**ECF No. 16 at 9**). The United States now seeks to transmit the seized property to France in accordance with France's request. Ms. Vasarely opposes the request, alleging that the search was illegal. (**ECF No. 1**). The United States has agreed that the artwork shall remain in Puerto Rico until the instant petition is resolved by this Court. (**ECF No. 1 at 10**).[6] But before the court can entertain Ms. Vasarely's request, it must be determined if it has jurisdiction to do so.

### The Evidentiary Hearing

In February 2024, an evidentiary hearing was held before this Court during which evidence was presented regarding whether the Court may exercise jurisdiction. (**ECF No. 104**); (**ECF No. 108**). During the hearing, Mrs. Vasarely herself was called as the first witness.[7] She also called as witnesses French criminal attorney Victoire Chatelin and FBI Special Agent Ryan Dingley. (**ECF No. 104**). In turn, the Government called FBI Special

---

[6]        Mrs. Vasarely also seeks injunctive relief under Federal Rule of Civil Procedure 65, to bar the Government from transporting the seized items to France. (**ECF No. 1 at 23**). In light of the United States's decision to retain the seized property pending the conclusion of this matter, this request is moot. To the extent she seeks injunctive relief that applies beyond the conclusion of this matter, her request must be denied. As will be further outlined below, the MLAT between the United States and France explicitly states that there is no private right of action to impede the effectuation of an MLAT request. Thus, the only relief Mrs. Vasarely may seek is the return of her property under Federal Rule of Criminal Procedure 41(g).

[7]        During the first day of the hearing, Mrs. Vasarely was unable to finish her direct testimony due to health concerns. (**ECF No. 104**); (**ECF No. 108**). She only testified for about two hours and was never subject to cross-examination. The parties proceeded to call their remaining witnesses. Thereafter, the Court scheduled an additional evidentiary hearing for June 26, 2024. (**ECF No. 119**). Counsel for Mrs. Vasarely was instructed to inform the Court by May 31, 2024 whether she would be able to finish her testimony or not, and if unable, closing arguments would be heard instead. (**ECF No. 119**). On May 31, 2024, counsel filed a "Motion in Compliance" with the Court's order, wherein they informed the Court that Mrs. Vasarely would not be testifying further. (**ECF Nos. 129–132**). "[I]n the interest of expediting this proceeding," the Government does not oppose the inclusion of Mrs. Vasarely's testimony as evidence, despite not having the benefit of cross-examining her. (**ECF No. 118 at 4–5**).

Agent Robert Giczy. (**ECF No. 108**). The parties introduced the following documents into evidence:

- Records of communications between Mrs. Vasarely, Respondent, and their representatives. (**ECF No. 104, Exhibit 1**).

- Request for Assistance submitted by the French Ministry of Justice to the United States. (**ECF No. 104, Exhibit 2**).

- Order of Criminal Search and Seizure of Tangible Personal Property entered by Court D'Appel de Paris in 2021. (**ECF No. 104, Exhibit 3**).

- Request for Assistance submitted by French Ministry of Justice to the United States in 2021. (**ECF No. 104, Exhibit 4**).

- Second Order of Criminal Search and Seizure of Tangible Personal Property entered by Court D'Appel de Paris in 2023. (**ECF No. 104, Exhibit 5**).

- Additional Request for Assistance submitted by French Ministry of Justice to the United States in 2023. (**ECF No. 104, Exhibit 6**).

- Curriculum Vitae of Victoire Chatelin. (**ECF No. 104, Exhibit 7**).

- December 26, 2011, Communication from French Police to Major Financial Crimes division regarding the French proceeding. (**ECF No. 104, Exhibit 8**) (SEALED).

- June 1, 2016 Order of Refusal of Additional Preparatory Inquiry entered by Court of First Instance of Paris. (**ECF No. 104, Exhibit 9**) (SEALED).

- Search Warrant Affidavit. (**ECF No. 104, Exhibit 10**).

Closing arguments were heard on June 26, 2024, after which the parties submitted their post-hearing briefs. (**ECF Nos. 143, 144, 147, 148**).

### III.    Applicable Law

#### A. The Legal Basis for the Seizure: 18 U.S.C. § 3512.

A Mutual Legal Assistance Treaty ("MLAT") is a legally binding treaty between sovereign nations to cooperate in the investigation and prosecution of transnational crimes. *See generally In re Commissioner's Subpoenas*, 325 F.3d 1287, 1290 (11th Cir.

2003). Where the United States has adopted an MLAT with a foreign sovereign, and that foreign sovereign submits a request to the United States for assistance investigating or prosecuting a crime, the United States government may move a federal court to issue a search warrant. *See* 18 U.S.C. § 3512(h)(2). As the Ninth Circuit has remarked, "MLATs represent a direct approach to achieving reciprocity with other nations[.]" *In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 564 (9th Cir. 2011) (hereafter "*In re Premises*") (emphasis omitted).

"The United States has entered into a number of . . . MLATs which typically provide for bilateral, mutual assistance in the gathering of legal evidence for use by the requesting state in criminal investigations and proceedings." *In re Request from United Kingdom Pursuant to Treaty Between Gov't of U.S. & Gov't of U.K. on Mut. Assistance in Crim. Matters in the Matter of Dolours Price*, 685 F.3d 1, 9 (1st Cir. 2012) (hereafter "*Dolours Price I*"). In 1998, the United States and France signed an MLAT agreement which, in relevant part, provides that each state "shall execute a request for the search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such search under the laws of the Requested State." *Treaty on Mutual Legal Assistance in Criminal Matters Between the United States of America and France*, art. 10, Fr.-U.S., Dec. 10, 1998, 2020 U.S.T.I.F. at 7 (the "Treaty"). The Treaty does not create a private right of action to challenge a search conducted pursuant to a request for mutual assistance under the Treaty.[8]

---

[8]       Article 1(3) of the Treaty states that "[t]his treaty is intended solely for mutual legal assistance between the States. The provisions of the Treaty shall not affect the exercise of rights otherwise available to private persons under the laws of the State presented with a claim based on such rights." The treaty explanatory notes also state:

Under the terms of the Treaty, each country must "designate a Central Authority to make and receive requests [formed] pursuant to [the] Treaty. For the United States of America, the Central Authority is the Attorney General." *Treaty*, art. 2, Fr.-U.S., Dec. 10, 1998, 2020 U.S.T.I.F. at 2. The Treaty thus designates the Attorney General of the United States as the entity responsible for receiving, reviewing, and responding to MLAT requests from the French Government. *Id*. art. 2–8 at 2–6.

To ensure that the Attorney General carefully reviews such requests, the Treaty requires that the Attorney General consult directly with the French Government, *id*. art. 2.2 at 2, and that any requests submitted to the Attorney General include a "description of the nature of the investigation or proceeding, including the facts on which the request is based[,] . . . the text of the applicable criminal statute[,] . . . the identity and nationality of the [targeted] person[,] . . . [and] a description of the evidence or other assistance sought[.]" *Id*. art. 4 at 3–4. Upon review of any such request, the Attorney General retains

---

Both Parties understand that, for the United States, the provisions of the Treaty do not create a new right on the part of a private person to obtain assistance, to suppress or exclude any testimony or evidence, or to impede the execution of a request. However, such rights of private persons as otherwise exist under United States law in this regard continue in this effect.

Moreover, there is a long-held presumption that "international agreements, even those directly benefitting private persons, generally do not create rights or provide for a private cause of action in domestic courts." *Dolours Price I*, 685 F.3d at 11. Citing this presumption, the First Circuit and its sister circuits have denied petitions to quash or modify an MLAT request absent express language in the treaty providing for a private right of relief. *Id*. at 9. ("The appellants' claims under the US–UK MLAT fail because appellants are not able to state a claim that they have private rights that arise under the treaty, and because a federal court has no subject matter jurisdiction to entertain a claim for judicial review of the Attorney General's actions pursuant to the treaty."); *U.S. v. Rommy*, 506 F.3d 108, 129–30 (2d Cir. 2007) ("For any number of reasons, sovereigns may elect to overlook non-compliance with particular treaty requirements in given cases. Thus, a proper respect for the diplomatic choices of sovereign nations prompts courts generally to apply a strong presumption against inferring individual rights from international treaties") (internal citations and quotations omitted); *U.S. v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 659 (3d Cir. 2002) ("Therefore, even it if is assumed for argument's sake that the United States violated the Treaty, Claimants have no private right to enforce its terms."). Accordingly, the Court finds that the Treaty creates no private right of action. As such, Mrs. Vasarely's arguments that the MLAT request is not in compliance with Articles 11 and 12 of the Treaty are without merit. (**ECF No. 1 at 5**, **22**, **38**). She does not have a private right to enforce the Treaty's terms.

the discretion to deny assistance if "the offense to which the request relates is a political offense or an offense related to a political offense" or "execution of the request would prejudice its sovereignty, security, public order, or other essential interests[.]" *Id.* art. 6 at 4–5. It is only after this process of Executive review that the United States will file an application for a search warrant pursuant to an MLAT request. *See United States v. Trustees of Boston College*, 718 F.3d 13, 21 (1st Cir. 2013) (noting that, pursuant to a similar treaty between the United States and Great Britain, "it is the Attorney General who decides whether to accede to a request from the UK, to narrow compliance to a certain aspect of said request or to decline to cooperate altogether."); *see also* (**ECF No. 4 at 5 ¶ 9 – 9 ¶ 22**).

In the United States, MLAT requests from foreign nations are governed by 18 U.S.C § 3512, "which was enacted as part of the Foreign Evidence Request Efficiency Act of 2009." *Dolours Price I*, 685 F.3d at 9. "The principal purpose of Section 3512 was to streamline foreign evidence requests, making it easier for the United States to respond to requests by allowing them to be centralized and by putting the process for handling them within a clear statutory system." *United States v. Trustees of Boston College*, 831 F. Supp. 2d 435, 447 (D. Mass. 2011).

Section 3512 states that, "[u]pon application . . . a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance." 18 U.S.C. § 3512(a)(1). The statute expressly provides that such orders may include "the issuance of . . . a search warrant, as provided under Rule 41 of the Federal Rules of Criminal Procedure." 18 U.S.C. § 3512(a)(2)(A). A request for such orders must be "filed in the district in which the place or person to be searched is located" and the warrant may be issued "only if the foreign offense for which the evidence is sought involves conduct

that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law." 18 U.S.C. § 3512(d)– (e). However, Section 3512 does not expressly create a private right of action to challenge searches authorized under the statute.[9]

### B. The Legal Basis for this Petition: Federal Rule of Criminal Procedure 41(g).

A delicate balance of powers exists between the Judicial and Executive Branches of government in the review and execution of MLAT requests from foreign states. On the one hand, Mrs. Vasarely challenges the Government's authority to enforce its treaty obligations with France. As with any dispute concerning the conduct of foreign affairs, the Judicial Branch owes deference to the Executive in this context. U.S. CONST. art. II, § 2, cl. 2; *In re Premises*, 634 F.3d at 572-573 ("The court's role in this context is limited . . . and must be tempered by the recognition that the field of foreign affairs is one that the Constitution entrusts to the President and the Congress.").[10] However, such deference is not unlimited. *See In re Premises*, 634 F.3d 557, 572 (9th Cir. 2011) (noting that "[t]he Constitution's separation of powers does not permit either the legislative or executive branch to convert the judicial branch into a mere functionary" and that there are "situations in which the Constitution might require the district court to deny a request for assistance."); *Dolours Price II*, 718 F.3d at 23 (ruling "that the enforcement of subpoenas is an inherent judicial function which, by virtue of the doctrine of separation of powers,

---

[9]     Because Section 3512 does not create an express right of action, the Court entertains Mrs. Vasarely's petition as a request that the Court exercise its equitable jurisdiction under Rule 41(g) of the Federal Rules of Criminal Procedure. Whether Section 3512 leaves the federal courts any discretion to quash a subpoena or warrant that runs afoul of the terms of the statute remains an open question. *See Dolours Price I*, 685 F.3d at 14 (declining to reach the issue). Since that question is not one that the Court need resolve here, the Court declines to reach the issue.

[10]     The Court notes that the statute analyzed in *In re Premises* is 28 U.S.C. § 1782(a) which, while similar to 18 U.S.C. § 3512, is inapplicable to the case at bar. *See Dolours Price I*, 685 F.3d at 14 n. 17.

cannot be constitutionally divested from the courts of the United States"); *Am. Ins. Ass'n v. Garamendi,* 539 U.S. 396, 416 n.9, (2003) (treaty obligations are "subject . . . to the Constitution's guarantees of individual rights").

Therefore, there is no dispute "that treaty obligations are subject to some constitutional limits." *Dolours Price I*, 685 F.3d at 15; *see also Am. Ins. Ass'n v. Garamendi,* 539 U.S. 396, 417 n. 9, 123 S. Ct. 2374, 156 L.Ed.2d 376 (2003) (treaty obligations are "subject . . . to the Constitution's guarantees of individual rights"). Were that not the case, the judiciary would be left the untenable task of "rubber stamping" Executive actions that violate the Constitution. *See In re Req. from the United Kingdom Pursuant to the Treaty between the Govt. of the U.S. and the Govt. of the United Kingdom on Mut. Assistance in Crim. Matters in the Matter of Dolours Price,* 718 F.3d 13, 22-23 (1st Cir. 2013) (hereafter "*Dolours Price II*") (ruling that the federal courts retain the power to quash a subpoena issued under Section 3512, as a contrary holding would permit the "unacceptable conclusion that the executive branch [may] exercise judicial power") (quotations omitted). As the Ninth Circuit noted in a closely related context, it is easy to "[c]onceive of situations in which the Constitution might *require* the district court to deny a request for assistance. For example, if credible evidence demonstrated that compliance with a subpoena would lead to an egregious violation of human rights, such as torture, then the Constitution may require the courts to deny assistance." *In re Premises*, 634 F.3d at 572–73 (quoting *Zschernig v. Miller*, 389 U.S. 429, 432 (1968)) (emphasis added). Accordingly, a federal court can — at the very least — consider constitutional challenges to MLAT requests. *In re Premises*, 634 F.3d 557, 572 (9th Cir. 2011) ("We therefore hold that, in the context of an MLAT request, a district court may not enforce a subpoena that would offend a constitutional guarantee.").

In light of these principles, Mrs. Vasarely invokes the equitable jurisdiction of the Court. Under Federal Rule of Criminal Procedure 41(g), "[a] person aggrieved by an unlawful search and seizure of the property or by the deprivation of property may move for the property's return[.]" FED. R. CRIM. P. 41(g); *see also Perez-Colon v. Camacho*, 206 F. App'x 1, 2 (1st Cir. 2006). "Where a Rule 41(g) petition is made by a party against whom no criminal charges have been brought, such a motion is in fact a petition that the Court invoke its civil equitable jurisdiction." *Gulf Coast Pharm. Plus v. United States*, 22-cv-0263, 2023 WL 3099873, at *3 (S.D. Miss. Apr. 26, 2023); *Matter of Ninety-One Thousand Dollars in U.S. Currency*, 715 F. Supp. 423, 427 (D.R.I. 1989) ("federal courts have variously found the authority to hear pre-indictment motions for return of property not only in the statutory grant of jurisdiction embodied in Rule 41(e) but also in the longstanding, non-statutory doctrine of equitable or 'anomalous' jurisdiction . . . .").[11] Notably, a district court must show due "caution and restraint" before exercising its equitable jurisdiction. 3A Charles A. Wright *et al.*, Federal Practice and Procedure § 690 (4th ed. 2008).

**The Richey Factors:**

To prevent district courts from exercising their equitable jurisdiction too liberally, many circuits follow the test set out by the Fifth Circuit in *Richey v. Smith*. 515 F.2d 1239, 1243 (5th Cir. 1975). *See e.g.*, *Lindell v. United States*, 82 F.4th 614, 619 (8th Cir. 2023); *Trump v. United States*, 54 F.4th 689, 697 (11th Cir. 2022); *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005). In *Richey*, the Fifth Circuit listed four factors a district

---

[11]    After the 2002 amendments to Rule 41, "[w]hat was formerly Rule 41(e) is now found at Rule 41(g) with minor stylistic changes." *Cardona-Sandoval*, 518 F.3d at 17.

court should consider in deciding whether to exercise its equitable jurisdiction over a Rule 41(g) motion. 515 F.2d at 1243. These factors are:

> (1) whether the Government displayed a callous disregard for the constitutional rights of the movant; 2) whether the movant has an individual interest in and need for the property he wants returned; 3) whether the movant would be irreparably injured by denying return of the property; and 4) whether the movant has an adequate remedy at law for the redress of his grievance.

*Trump v. United States*, 54 F.4th at 697 (citing *Richey*, 515 F.3d at 1243–44). While the First Circuit has never expressly adopted the *Richey* test, it has traditionally applied the same factors set forth in *Richey*. *See Angel-Torres v. United States*, 712 F.2d 717, 720 (1st Cir. 1983) (evaluating whether the movant had an adequate remedy at law, a need for the items seized, the harm faced by the movant, and the constitutionality of the seizure).[12] Accordingly, as this Court has ruled previously, it will apply the test adopted by *Richey* and its progeny to the instant petition. *See Vasarely v. United States*, Civ. No. 23-mc-256, 2024 WL 278402 (D.P.R. Jan. 25, 2024).

While the decision to exercise its equitable jurisdiction is "subject to the sound discretion of the district court," "[t]ypically, courts require [movants] to satisfy *at least* three of the four [*Richey*] factors before exercising equitable jurisdiction over Rule 41(g) civil cases." *Trump v. United States*, 22-cv-13005, 2022 WL 4366684, at *7 (11th Cir. Sept. 21, 2022) (internal quotations and citations omitted). Notably, whether a movant has shown a callous disregard for their constitutional rights is the "foremost consideration." *Id.* (citing *United States v. Chapman*, 559 F.2d 402, 406 (5th Cir. 1977)).

---

[12] The First Circuit has also referenced the concept of "anomalous jurisdiction" with regards to a pre-indictment motion for return of seized property. *See In re Worksite Inspection of Quality Prod., Inc.*, 592 F.2d 611, 614 (1st Cir. 1979). The exercise of "anomalous jurisdiction" requires a district court to evaluate the same factors as the *Richey* test, with the exception of the second (whether the movant has an individual interest in and need for the property he wants returned). *Id.* at 616.

## IV.    Analysis

As noted above, the *Richey* factors should be considered in deciding whether to exercise its equitable jurisdiction over a Rule 41(g) motion. First, the Court must determine whether the Government has displayed a "callous disregard for the constitutional rights of the movant[.]" *Trump v. United States*, 54 F.4th at 697 (citing *Richey*, 515 F.3d at 1243–44). Second, the Court must weigh whether the movant has an individual interest in and need for the property she wants returned. *Id*. Third, the Court must decide whether the movant would be irreparably injured if the property were not returned. *Id*. And finally, the Court must consider whether the movant has an adequate remedy at law to redress her grievances. *Id*.

Whether the Court may exercise its equitable jurisdiction to entertain a challenge to a search and seizure conducted under 18 U.S.C. § 3512 is an issue of first impression in this Circuit, and prior caselaw across the federal judiciary has not explored in depth the degree to which a federal court may properly exercise such discretion.

### A. Callous Disregard for Constitutional Rights

Mrs. Vasarely must meet a high bar to establish that she was subjected to Government conduct that evinced a "callous disregard" for her constitutional rights. In order to invoke the Court's equitable jurisdiction, Mrs. Vasarely must show more than a mere violation of her constitutional rights: she must meet a higher threshold by establishing that her rights were callously disregarded. *See Lindell*, 82 F.4th at 619 ("[M]ost subjects of a search warrant cannot satisfy the *extraordinarily* high hurdle of a callous disregard of their constitutional rights, which is intentional and designed to prevent a 'flood of disruptive civil litigation.'") (emphasis added); *Burum v. United States*, 11-cv-01570, 2014 WL 12596719, at *4 (C.D. Cal. Apr. 2, 2014) ("As an initial matter, the

Court notes that a callous disregard for [a movant's] constitutional rights is a higher threshold than a mere violation of [a movant's] constitutional rights."); *Matter of Search of Specialty Fulfillment Ctr.*, 17-mc-09979, 2018 WL 785861, at *4 (D. Idaho Feb. 8, 2018) (same).

"The vast majority of subjects of a search warrant have not experienced a callous disregard of their constitutional rights, [a standard which] ensures that equitable jurisdiction remains extraordinary. Otherwise, a flood of disruptive civil litigation would surely follow." *Trump,* 54 F.4th at 698 (quotations and citations omitted); *Lindell*, 82 F.4th at 619. Numerous district courts have reached the same conclusion, holding that the Government did not exhibit a callous disregard of constitutional rights where it seized private property pursuant to a valid warrant. *Khudainatov v. United States*, 23-cv-01946, 2023 WL 7501393, at *4 (S.D. Cal. Nov. 13, 2023) (finding no callous disregard of constitutional rights when a search and seizure was conducted pursuant to a warrant issued by a Magistrate Judge upon a finding of probable cause); *Matter of Search of 94-1018 Kaloli Loop, Waipahu, Hawaii 96797*, 18-mc-00408, 2019 WL 179559, at *2 (D. Haw. Jan. 11, 2019) (". . . the IRS followed proper search warrant procedures and obtained the Magistrate Judge's approval to conduct the search following a showing of probable cause. This evidences the Government's respect for — not callous disregard of — [the movant's] constitutional rights."); *Matter of Search of Specialty Fulfillment Ctr.*, 17-mc-09979, 2018 WL 785861, at *5 (D. Idaho Feb. 8, 2018) ("The Government followed proper procedure, obtained a warrant, and executed the warrant approved by the Magistrate Judge. [] Clearly, the conduct of the Government here does not rise to the level of callous disregard for [the movant's] Fourth Amendment rights."); *Chaim v. United States*, 692 F. Supp. 2d 461, 475 (D.N.J. 2010) ("First, there has been no callous disregard of the

[movant's] rights by the Government. The seizure was made pursuant to a warrant supported by probable cause").

To establish that her constitutional rights have been subject to the callous disregard of Government officials, Mrs. Vasarely raises a series of arguments characterizing the seizure of her property as unlawful. These arguments fall into three broad categories. First, Mrs. Vasarely argues that the Affidavit filed in support of the application for a search warrant was constitutionally defective. Second, Mrs. Vasarely argues that the resulting search was overly broad. Lastly, Mrs. Vasarely insists that the search ran afoul of the terms of 18 U.S.C. § 3512, such that the Court must exercise equitable jurisdiction and order the Government to return the items seized. As explained in detail below, the Court finds that the Government has not engaged in a "callous disregard" of Mrs. Vasarely's rights. The Court will address each argument in turn.[13]

---

[13]    The Court briefly addresses two additional arguments raised by Mrs. Vasarely. First, she argues that she is the victim of a *Brady* violation; but she does not develop this argument. (**ECF No. 1 at 2**). In response, the Government asserts this argument was waived, and Mrs. Vasarely does not dispute this in her reply. (**ECF No. 16 at 43**). Accordingly, it is deemed waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *see also Taylor v. Moskow*, 600 F. App'x 2, 3 (1st Cir. 2015) (citing same). Second, Mrs. Vasarely argues that the seizure of the artwork amounts to an illegal taking in violation of the Fifth Amendment of the United States Constitution. (**ECF No. 1 at 4**). The Fifth Amendment's takings clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. Ordinarily, however, the "police power . . . encompasses the government's ability to seize and retain property to be used as evidence in a criminal prosecution" such that "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008). Mrs. Vasarely therefore did not suffer a "taking" when her property was seized by the Government pursuant to its police powers. Whether she would have a Takings claim if the Government were to cause damage to her property is an open question of constitutional law not presented by this Petition. *Baker v. City of McKinney, Texas*, 145 S. Ct. 11, 13 (2024) (declining to decide "whether the Takings Clause requires compensation when the government damages private property pursuant to its police power" and characterizing the issue as an "important and complex question that would benefit from further percolation in the lower courts").

> ### i.    The Affidavit

The Fourth Amendment of the United States Constitution establishes "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. To safeguard this right, the Constitution requires that "no [search] warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id*.

"A finding of probable cause demands proof sufficient to support a fair probability that a crime has been committed, and that evidence of that crime is likely to be found within the objects to be searched." *United States v. Sheehan*, 70 F.4th 36, 44 (1st Cir. 2023) (quotations omitted). This is plainly "not a high bar": if the totality of the circumstances set forth in the warrant application and its accompanying affidavit establish a "fair probability" that a crime has been committed, a finding of probable cause is warranted. *Id*. at 44–45. In this context, "elaborate specificity" is not required. *United States v. Clark*, 685 F.3d 72, 78 (1st Cir. 2012). Furthermore, "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts." *Id*.

Mrs. Vasarely challenges the validity of the Affidavit based on a theory of improper motive: according to Mrs. Vasarely, criminal proceedings were initiated against her in France in bad faith. Specifically, she alleges that her property was seized not for use in French criminal proceedings, but for the nefarious purpose of "permanently expatriat[ing]" and "ultimately expropriat[ing]" the artwork for display in French art

museums.[14] (**ECF No. 143 at 12**). On that basis, Mrs. Vasarely insists, the Court must find the Affidavit defective and order the return of the seized property.[15]

This argument finds no support in the law. "It is settled beyond peradventure that a police officer's subjective motive, even if improper, cannot sour an objectively reasonable search." *Clark*, 685 F.3d at 78 (quotations omitted). Moreover, Mrs. Vasarely alleges only that the French authorities who initiated the underlying MLAT request acted in bad faith, not that the affiant himself was motivated by an impermissible subjective intention. Assuming for the sake of argument that French authorities did transmit the request in bad faith – a finding not supported by the record – Mrs. Vasarely identifies no Constitutional right which was violated by either French or American authorities when the MLAT request was transmitted, much less how such actions might confer upon this Court the extraordinary equitable powers that Mrs. Vasarely invokes.

This theory of improper motive is simply beside the point: "[t]he ultimate question is . . . whether the totality of the facts and circumstances described in the affidavit, viewed

---

[14]     Relatedly, Mrs. Vasarely maintains that the affidavit for the search warrant fails to establish that the Vasarely artworks are "evidence" at all, such that they are required for use in the French criminal proceedings. (**ECF No. 1 at 31**). Instead, she contends that the artwork is only needed for appraisal purposes, and therefore need not be removed from her possession. (**ECF No. 1 at 33**). To the extent these arguments have any legal relevance, a contention for which Mrs. Vasarely provides no support, the Court disagrees. A plain reading of the underlying MLAT request demonstrates that France has requested the artwork be removed to France because it is evidence in the ongoing criminal matter involving Mrs. Vasarely. *See* (**ECF No. 4 at 52**) (asserting that the "works likely to be held directly or indirectly by [Mrs. Vasarely] thus constitute *material evidence* of her participation in the offending acts.") (emphasis added).

[15]     In addition, Mrs. Vasarely appears to argue that her Rule 41(g) petition should be granted because she is factually innocent of the criminal offenses for which she is being investigated in France. Specifically, she emphasizes that she has already defeated civil claims for fraud and breach of fiduciary duty in a 2009 civil suit filed in the Northern District of Illinois, a fact that she believes "undermines" the substantive allegations of the Affidavit. (**ECF No. 1 at 29**). But the question before the Court is not whether the Government has definitively proved that she committed the criminal offenses for which she is being investigated by French authorities. The narrow question before this Court is simply whether the Affidavit established probable cause to believe that she is being investigated or prosecuted for the commission of a "foreign offense . . . [involving] conduct that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law." 18 U.S.C.A. § 3512(e). The probable cause standard "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (quotations and citations omitted).

objectively, gives rise to a fair probability that a crime has been committed and that the search, if allowed, will reveal evidence of it." *Id.* Here, the Affidavit clearly established probable cause to believe that a criminal investigation was initiated against her in France, thus authorizing the issuance of the search warrant pursuant to 18 U.S.C. § 3512.[16] As testified by Agent Dingley, who prepared the affidavit, he reviewed the pertinent details of the MLAT before preparing the affidavit and concluded that there was "dual criminality" based on the facts presented by the French authorities. (**ECF No. 105 at 111:2–21**); (**ECF No. 4 at 9 ¶ 22, 12–13 ¶¶ 29–34**). Specifically, the Affidavit alleged that the "French Ministry of Justice submitted a request . . . for assistance to the United States" in which it explained that "the Judicial Court of Paris was investigating [Mrs. Vasarely] for offenses including breach of trust, concealment of breach of trust, and laundering, in violation of the French Penal code[.]" (**ECF No. 4 at 6 ¶ 12 – 7 ¶ 13**). The Affidavit went on to explain that the alleged criminal conduct under investigation related to "the misappropriation of art and cash through" the 1995 arbitral proceedings, *id.* at 6–7 ¶ 13, where Mrs. Vasarely allegedly used her position as Chairperson of the Board of Directors of the Vasarely Foundation to "misappropriate[e] . . . original artworks . . . for her own personal benefit" by allegedly conspiring with a group of associates to fix the arbitration process, which resulted in an arbitral award to the Vasarely family valued at "approximately 40 million euros", a substantial portion of which fell into the hands of Mrs. Vasarely. *Id.* at 12 ¶ 29 – 13 ¶ 32.

---

[16]    Citing to the "dual criminality" requirement of 18 U.S.C. § 3512, Mrs. Vasarely does argue that the Affidavit failed to establish probable cause to believe that "the foreign offense for which the evidence is sought involves conduct that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law." The Court addresses that argument below. *See infra* Section IV.A.i.c.2.

Having failed to establish that her constitutional rights were violated, Mrs. Vasarely falls far short of establishing that the Government exhibited a "callous disregard" for her constitutional rights. *See Trump*, 54 F.4th at 698 ("We have emphasized again and again that equitable jurisdiction exists only in response to the most callous disregard of constitutional rights, and even then only if other factors make it clear that judicial oversight is absolutely necessary."); *see also Lindell*, 82 F.4th at 621. Here, the challenged seizure was conducted pursuant to a warrant properly issued by a neutral magistrate upon a finding of probable cause. The Affidavit was 25 pages long and included detailed information concerning the legal basis and intended scope of the search. The resulting warrant explicitly authorized the search of Mrs. Vasarely's home for the artwork in question, as well as any electronic property attesting to the origin of the artwork or its ownership, authenticity, or market value. (**ECF No. 3-1 at 5**). The Government did not exceed the parameters of this warrant, nor does Mrs. Vasarely allege that it did. In fact, the Government notified her in advance that the search and seizure would be conducted, advised Mrs. Vasarely as to the date of the raid and requested that a representative for Ms. Vasarely be present during the search. (**ECF No. 144 at 2**); (**ECF No. 105 at 119–120**). The agents who conducted the search did not "breach" the door to Mrs. Vasarely's residence, but instead announced their presence, requested that Mrs. Vasarely exit the residence, and entered without any use of force. (**ECF No. 105 at 120:2–23**). In order to ensure that the seizure did not exceed its lawful scope, a specially designated team of FBI agents with expertise in art helped to properly identify the property targeted in the warrant. (**ECF No. 105 at 121:13–17**). Several French investigators were also present to assist in "identify[ing] and locating the correct artworks." (**ECF No. 105 at 121:18–23**). The agents did not seize all of the artwork contained in Mrs. Vasarely's home, but only

the artwork targeted by the search warrant, and Mrs. Vasarely does not contend otherwise. The Court therefore finds that the Affidavit was not constitutionally defective.[17]

### ii.    The Search Warrant and the Scope of the Search

Mrs. Vasarely argues that the scope of the search warrant issued by the Magistrate Judge was overbroad. Specifically, she maintains that the search warrant unlawfully "allowed federal agents to make an imaged copy of [her] entire computer and contain[ed] no limitations on what the U.S. Government will review or what it will transmit to the French Authorities." (**ECF No. 1 at 41**). She expresses concern over various privileged materials contained in the items seized, as well as "completely irrelevant personal and private items." (**ECF No. 1 at 42**). She maintains this "indiscriminate copying, and presumptively . . . transmission" of her entire computer files to the French authorities would be unlawful. (**ECF No. 1 at 42**). She also takes issue with the fact that the warrant did not "prescribe how or when irrelevant and privileged information will be returned to [her], if the Government will retain it indefinitely, and what will be transmitted to the Government of France." (**ECF No. 23 at 20**). In response, the Government argues the search warrant did not lack particularity, and that the Government's imaging of the devices was lawful. (**ECF No. 16 at 47**). The Court agrees.

---

[17]    Mrs. Vasarely does raise one additional argument regarding the validity of the Affidavit: she argues that the Affidavit is constitutionally unsound because it failed to mention that the criminal case in France is time-barred under French law. (**ECF No. 1 at 29**). Even if this were true as a matter of French law – a finding the Court does not make – Mrs. Vasarely provides no legal support for the proposition that a search warrant affidavit is invalid for failing to articulate a criminal defendant's possible affirmative defenses. *Cf. United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (noting that an omission from the affidavit for a search warrant will only invalidate the resulting warrant if the omission was "intentional or reckless" and where "the omitted information, if incorporated into the affidavit, [would have been] sufficient to vitiate probable cause."). The Government has attached numerous orders from the French courts unanimously stating that the matter is not time-barred. (**ECF No. 18-1 at 88-116, 116-139**). Regardless, Mrs. Vasarely must raise her affirmative defenses in the French proceedings.

"The Fourth Amendment by its terms requires particularity in the warrant[.]" *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). This particularity requirement prohibits the issuance of "general warrants" designed to "authorize the wholesale rummaging through a person's property in search of contraband or evidence." *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999). Nevertheless, a warrant is not necessarily overbroad where it authorizes the Government to inspect an entire digital device in search of documents relating to a suspected crime. *Id.* at 535 ("As a practical matter, the seizure and subsequent off-premises search of the computer and all available disks was about the narrowest definable search and seizure reasonably likely to obtain the images."); *see also United States v. Aboshady*, 951 F.3d 1, 5 n. 2 (1st Cir. 2020) (finding no Fourth Amendment violation where Government retained and searched thousands of digital documents containing personal information in search of evidence of a crime). Although digital devices are likely to contain "a plethora of information unrelated to the government's investigation, such as business-related correspondence and transactions; photographs; passwords; apps; potential attorney-client communications; and private communications with friends, family, and business associates, this fact does not transform [a] warrant [authorizing a search of the entire device] into a general warrant." *Lindell v. United States*, 82 F.4th at 620. As such, a warrant targeting a computer or smartphone does not necessarily require a heightened showing of particularity. *United States v. Corleto*, 56 F.4th 169, 177 (1st Cir. 2022) (finding unpersuasive the appellant's argument that targeting smartphones categorically requires a greater standard of particularity, and holding that the warrant's authorization to seize "any computer or electronic media that were or may have been used as a means to commit the offenses described on the warrant, including the production, receipt, possession, distribution, or

transportation of child pornography" satisfied "whatever heightened standard might reasonably apply . . . ."); *United States v. Klyushin*, 643 F. Supp. 3d 261, 270 (D. Mass. 2022) ("It is true that the search warrants directed Apple to broadly turn over to the government an iCloud account that contained substantial details of [the defendant's] personal life that went beyond the temporal and substantive scope of the categories in the search warrants. However, the warrants only authorized the government to search for specific categories of information from that seized account.").

The warrant that authorized the search of Mrs. Vasarely's home described the things to be searched and seized with sufficient particularity. The warrant identified the particular records and information that law enforcement could seize from Mrs. Vasarely's devices. Specifically, the warrant authorized agents to seize and search "[a]ny document, including digital versions, attesting to the origin of the works in Attachment b-1, their ownership, authenticity, or market value." (**ECF No. 3-1 at 5**). In doing so, the warrant was properly tailored to the Government's legitimate investigatory needs. The warrant went on to state:

> This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

(**ECF No. 3-1 at 5**).

Moreover, the off-site imaging of digital devices does not necessarily render a search overbroad. *See Lindell*, 82 F.4th at 620 (approving law enforcement's copying of

the electronic data seized and delivering it thereafter to attorneys for the government for independent review). Federal Rule of Criminal Procedure 41(e)(2)(B) authorizes the "seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." FED. R. CRIM. P. 41(e)(2)(B). And to the extent that the search of Mrs. Vasarely's digital devices raises any legitimate risks to her privacy, the parties have jointly adopted a filter protocol which will mitigate any risk that privileged or irrelevant materials will be transmitted. On November 16, 2023, the parties filed a jointly proposed filter protocol to safeguard private, irrelevant and privileged materials on the devices.[18] (**ECF No. 79-1**). The Court finds that the proposed filter protocol is reasonable and adequately protects Mrs. Vasarely's rights.[19] The First Circuit has "tacitly approved of the use of filter teams." *Matter of O'Donovan*, 635 F. Supp. 3d 40, 43 (D. Mass. 2022) (citing *United States v. Aboshady*, 951 F.3d 1, 5 (1st Cir. 2020)). "Various district courts within the Circuit have also presumed without issue or elaboration that the use of a filter team to segregate non-responsive or privileged communications does not run afoul of any established legal precedent." *Matter of O'Donovan*, 635 F. Supp. 3d 40, 43 (D. Mass. 2022) (collecting cases). Because the proposed filter protocol adequately mitigates the risk that the scope of the Government's

---

[18]      Because the Government's review, transmission, and retention of Mrs. Vasarely's digital property will be governed by the filter protocol, Mrs. Vasarely's reliance on *In Matter of Amato* is inapposite. 05-mc-29, 2005 WL 1429743, at *11 (D. Me. June 17, 2005), *report and recommendation adopted*, 05-cv-29, 2005 WL 1705318 (D. Me. July 20, 2005) (holding that search warrants are overbroad when there is an "absence of any further express limitation on the parameters of an off-site search and seizure").

[19]      The Court notes that Mrs. Vasarely raises a series of objections to the specifics of the filter protocol. (**ECF No. 79-1**). However, because none of those objections arise from Government conduct evincing a "callous disregard" of Mrs. Vasarely's constitutional rights, the Court declines to address those objections or compel the Government to modify the filter protocol.

search could exceed reasonable limits, the Court does not find that the warrant is overbroad.[20]

### iii.    The lawfulness of the search under 18 U.S.C. § 3512

Mrs. Vasarely raises multiple arguments that call into question the lawfulness of the challenged search under 18 U.S.C. § 3512, which governs MLAT requests from foreign nations. *See Dolours Price I*, 685 F.3d at 9. Under that statute, "a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance." 18 U.S.C. § 3512(a)(1). The statute expressly provides that such orders may include "the issuance of . . . a search warrant, as provided under Rule 41 of the Federal Rules of Criminal Procedure." 18 U.S.C. § 3512(a)(2)(A). A request for such orders must be "filed in the district in which the place or person to be searched is located" and the warrant may be issued "only if the foreign offense for which the evidence is sought involves conduct that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law." 18 U.S.C. § 3512(d)–(e).

---

[20]    The fact that the warrant does not "prescribe how or when irrelevant and privileged information will be returned to [Mrs. Vasarely], if the Government will retain it indefinitely, and what will be transmitted to the Government of France," does not render the warrant invalid. (**ECF No. 23 at 20**). The warrant is clear in that the only electronic items permitted to be seized are those that attest to the origin of the works, their ownership, authenticity, or market value, as that is what was requested by the French Government. (**ECF No. 3-1 at 5**). Moreover, there is no strict rule arising from constitution or statute mandating that warrants provide timelines for the return of privileged or irrelevant items:

> While consideration was given to a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place, the practical reality is that there is no basis for a "one size fits all" presumptive period. A substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs. The rule does not prevent a judge from imposing a deadline for the return of the storage media or access to the electronically stored information at the time the warrant is issued.

Fed. R. Crim. P. 41 advisory committee's note to the 2009 amendment. Of course, should the Government refuse to return the privileged materials to Mrs. Vasarely in a timely manner going forward, she may litigate this issue at that time.

Each of Mrs. Vasarely's arguments arising from the requirements set forth in 18 U.S.C. § 3512 faces a fundamental obstacle: because the *Richey* test requires a showing of callous disregard of *constitutional* rights, it is not clear that violations of Section 3512 are sufficient to trigger the equitable jurisdiction of the Court. *See Dolours Price I*, 685 F.3d 1, 14 (1st Cir. 2012) (declining to reach the issue). There are good reasons to believe that, were the Government to fail to establish "dual criminality" under 18 U.S.C. § 3512(e), a federal court likely would have the authority to order the return of any items seized under the defective warrant. Indeed, in the absence of the dual criminality requirement, 18 U.S.C. § 3512 may potentially be unconstitutional. *See generally Dolours Price I*, 685 F.3d at 15; *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 417 n. 9 (2003) (treaty obligations are "subject . . . to the Constitution's guarantees of individual rights").[21] However, the Court need not decisively reach the issue in this case: because Mrs. Vasarely fails to establish that the Government ever violated the terms of Section 3512, the Court need not decide whether such violations, if any, would be sufficient to trigger the Court's equitable jurisdiction.

### a. The Government's Use of 18 U.S.C. § 3512

Mrs. Vasarely maintains that the Government's use of 18 U.S.C. § 3512 to effectuate the MLAT request "is at worst, a pretext, and at best, the incorrect statute, thereby depriving [her] of crucial rights she would otherwise be entitled to." (**ECF No. 143 at 13**). She maintains that "[o]ther statutes, which the Government chose to disregard . . . such as civil forfeiture and enforcement of foreign forfeiture orders statutes" would have

---

[21]    Moreover, as Mrs. Vasarely notes, prior cases that have analyzed the reach of judicial discretion under 28 U.S.C. § 1782 – a predecessor to 18 U.S.C § 3512 – have found that discretion exists under that statute. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004); cf. *Dolours Price I*, 685 F.3d 1, 14 n. 17 (1st Cir. 2012).

provided her the right to challenge the Government's actions on the merits. (**ECF No. 143 at 14**). Yet 18 U.S.C § 3512 expressly provides that this statute remains an available mechanism even where another statute may be available to a "foreign authority . . . [seeking to obtain] assistance in a criminal investigation or prosecution." 18 U.S.C § 3512(g). That statute therefore provides a legitimate basis for the challenged Government seizure, notwithstanding Mrs. Vasarely's contention that another mechanism may have been available to the Government. Even if another statute were suitable to the ends pursued by the Government in this case, it is plainly not the role of a federal court to control such discretionary enforcement decisions properly allocated to the Executive Branch. The fact that the Government could have invoked another statute and chose not to do so is therefore no basis for this court to exercise its extraordinary equitable powers and order the return of the property seized from Mrs. Vasarely's residence.

### b.  Dual Criminality

By the terms of 18 U.S.C. § 3512(e), "[a] federal judge may issue a search warrant under this section only if the foreign offense for which the evidence is sought involves conduct that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law." 18 U.S.C.A. § 3512(e). Mrs. Vasarely argues that the Affidavit fails to satisfy this "dual criminality" standard. The Government disagrees, likening the pending foreign charges to the offense of "fraud" under Puerto Rico law.[22] *See* 33 L.P.R.A. § 5272.

---

[22]    The Government also compares Mrs. Vasarely's foreign charges to federal mail and wire fraud charges under 18 U.S.C. §§ 1341–1343. (**ECF No. 16 at 32**). The Court need not analyze whether the Government has satisfied the "dual criminality" standard as to these crimes, however, as the Government satisfies the requirement under 33 L.P.R.A. § 5272.

The Affidavit alleges that Mrs. Vasarely is under investigation in France for the French offenses of "breach of trust, concealment of breach of trust, and laundering[.]" (**ECF No. 4 at 6–7 ¶ 13**). According to the Affidavit, these offenses relate to "the misappropriation of art and cash through" the 1995 arbitral proceedings, *id*. at 6–7 ¶ 13, where Mrs. Vasarely allegedly used her position as Chairperson of the Board of Directors of the Vasarely Foundation to "misappropriate[e] . . . original artworks . . . for the purposes of selling them for her own personal benefit[.]" *Id*. at 12 ¶ 29. Specifically, the Affidavit alleges that Mrs. Vasarely conspired with a group of associates to fix the arbitration process, which resulted in an arbitral award valued at "approximately 40 million euros", a substantial portion of which fell into the hands of Mrs. Vasarely. *Id*. at 12 ¶ 29 – 13 ¶ 32. Describing this conduct as "conduct that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year . . . State law[,]" 18 U.S.C.A. § 3512(e), the Affidavit expressly cited to 33 L.P.R.A. § 5272. (**ECF No. 4 at 9 ¶ 22**).

Arguing that the Affidavit fails to satisfy the "dual criminality" requirement of Section 3512, Mrs. Vasarely lodges a series of complaints. (**ECF No. 1 at 25–29**). For one, she argues, the crimes for which she is being investigated in France are misdemeanors under French law. *Id*. at 26. Indeed, Mrs. Vasarely points out that she is not being charged with the crime of "fraud" under French law. *Id*. at 27.  Thus, according to Mrs. Vasarely, the federal and state offenses invoked by the Government are not legally "equivalent" to the offenses for which she is being investigated in France. *Id*. Moreover, she argues, "breach of trust" is a civil claim under Puerto Rico law, not a criminal offense. *Id*. at 28.

Yet each of these arguments misapprehends the governing standard. Under 18 U.S.C. § 3512(e), the relevant inquiry is about the underlying *conduct* for which Mrs. Vasarely is being investigated, not the formal title of the criminal offenses for which she is being investigated or prosecuted in France. 18 U.S.C. § 3512(e) ("A Federal judge may issue a search warrant under this section only if the foreign offense for which the evidence is sought *involves conduct* that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law") (emphasis added).

Under Puerto Rico law, a person convicted of a Crime Against Property, Patrimony or Fraud "shall be punished by imprisonment for a fixed term of eight (8) years" when they have personally performed or have induced another person to perform "acts or omissions that deprive another person or that affect the ownership rights or interests on real or personal property of said person, the State, or a third party to their detriment." 33 L.P.R.A. § 5272.[23] The Court finds that the Affidavit establishes probable cause to believe that, by allegedly conspiring with a group of associates to fix the 1995 arbitration process to her personal benefit and to the detriment of the Foundation, Mrs. Vasarely engaged in

---

[23]    The Statute reads as follows in the original Spanish:

Delitos Contra La Propiedad; Delitos Contra los Bienes y Derechos Patrimoniales; Fraude: Será sancionada con pena de reclusión por un término fijo de ocho (8) años, toda persona que fraudulentamente con el propósito de defraudar:

(a)    Induzca a otra a realizar actos u omisiones que afecten derechos o intereses patrimoniales sobre bienes inmuebles o bienes muebles de esa persona, del Estado o de un tercero, en perjuicio de éstos,

(b)    realice actos u omisiones que priven a otra persona o afecten los derechos o intereses patrimoniales sobre bienes inmuebles o bienes muebles para perjuicio de ésta, del Estado o de un tercero.

Si la persona convicta es una persona jurídica será sancionada con pena de multa hasta treinta mil dólares ($30,000).

conduct for which she could be charged under 33 L.P.R.A. § 5272. Accordingly, the Court finds that the Affidavit satisfies the dual criminality requirement under 18 U.S.C. § 3512(e).

Overall, Mrs. Vasarely has failed to demonstrate that any of her constitutional rights have been violated, much less callously disregarded. The Court thus finds that the first prong weighs strongly in favor of the Government.

### B. Personal Interest and Need in the Property

"The second *Richey* factor is whether [the petitioner] has an individual interest in and need for the material whose return [s]he seeks." *Trump*, 54 F.4th at 698–699. As the Court has previously ruled, Mrs. Vasarely has at least a possessory interest in the property. (**ECF No. 89 at 4 n.4**). Yet "personal interest in or ownership of a seized [item] is not synonymous with the need for its return." *Trump*, 54 F.4th at 699. "In most search warrants, the government seizes property that unambiguously belongs to the subject of a search. That cannot be enough to support equitable jurisdiction." *Id.*[24] Mrs. Vasarely must go further, demonstrating that she will face real and substantial harm if the specific items seized are not returned to her: "Courts that have authorized equitable jurisdiction have emphasized the importance of identifying specific documents and explaining the harm from their seizure and retention." *Id.* at 699 (citing *Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th 593, 600 (5th Cir. 2021)) (quotations omitted).

---

[24] Mrs. Vasarely argues in her opposition to the Government's post-evidentiary hearing brief that establishing need is a low threshold. (**ECF No. 147 at 13–14**). In so arguing, she cites to a Southern District of Georgia case from 1995 which noted that to "demonstrate an individual interest, the claimant need only show that items are of value and that he has a legal interest in them. This factor will only work to defeat jurisdiction if the items sought are contraband or are of 'no noteworthy need' to the claimant, such as wager slips." *Roberts v. DEA*, 1995 U.S. Dist. LEXIS 11249, at *TK (S.D. Ga. Jul. 25, 1995); (**ECF No. 147 at 13**). The Court declines to adopt this low threshold and will instead follow the Eleventh Circuit's lead.

In support of her petition for equitable relief, Mrs. Vasarely highlights her personal connection to the artwork seized, her intention to showcase the artwork globally, and her ongoing efforts to compile a "catalogue raisonné" of Master Vasarely's works. (**ECF No. 143 at 7–9**).

The Court finds that the evidence introduced by Mrs. Vasarely in support of her petition fails to establish a sufficiently pressing "need" for the artwork. As previously noted, Mrs. Vasarely's testimony before the Court was cut short by a serious medical incident, (**ECF No. 105 at 66:20 – 73:12**), and, due to related health issues, she never returned to testify. (**ECF No. 112**). For the vast majority of the testimony that she did provide, Mrs. Vasarely looked retrospectively at the strong sentimental bonds she had forged with Master Vasarely and his works earlier in her life. Explaining why she had chosen to dedicate her entire life to safeguarding and promoting the art of Master Vasarely, Mrs. Vasarely described the artist as a father figure whom she revered as a "god" and "genius". (**ECF No. 105 at 36:14–15, 37:19–25, 41:24, 44:18–25**). On his death bed, Mrs. Vasarely testified, Master Vasarely enlisted her to "protect" his work after his death and to "fight" for his legacy, praising her as "the only one" capable of carrying out the task. (**ECF No. 105 at 50:18 – 51:1, 56:12**). Mrs. Vasarely now argues that these "uniquely sentimental bond[s]" suffice to establish that the return of the seized property is necessary. (**ECF No. 143 at 7–8**). The Court is not persuaded. Whether Mrs. Vasarely has established a pressing and concrete "need" for the property in question is an inherently forward-looking question not addressed by evidence that she previously formed a set of intentions or attachments to the property seized. As such, the Court finds that Mrs. Vasarely's sentimental connection to the art seized from her home is not enough to establish a sufficiently pressing need for its return. *But see Gibani v. Barr*, Civ. No. 19-

1009, 2019 WL 8112511 at *2 (C.D. Cal. Oct. 11, 2019) (finding the petitioner had met their burden of demonstrating "need for the confiscated property" where the items seized were valuable and contained "personal irreplaceable photos and other memories[,]" yet denying the Rule 41(g) motion in light of the government's need for the property).

Moreover, in the only forward-looking elements of her testimony, Mrs. Vasarely failed to establish a concrete need for the *specific* property seized. While Mrs. Vasarely testified generally that she intended to showcase the artworks around the world, she provided no corroborating evidence that any plans were on the works, let alone that the specific artworks seized were actually involved in such plans. (**ECF No. 105 at 60−63**). She provided no Exhibition or Loan Agreement with any museum or gallery nor any dates for scheduled shows. She also did not provide any information regarding exhibition details such as duration, insurance, transportation, exhibition fees and publicity on how the artist and the exhibition were to be promoted. Moreover, she did not provide catalogues of the artwork to be showcased tying the seized artwork with any alleged planned exhibition. Simply put, the record is devoid of any evidence in support of Mrs. Vasarely's concrete need for the artwork in question.

In addition, Mrs. Vasarely also testified that she was working to compile a so-called "catalogue raisonné" of Master Vasarely's works, that is, a "catalog of *all* his work and the life of each work[.]" (**ECF No. 105 at 33:22 − 34:1**). Yet at no point did any of the evidence introduced by Mrs. Vasarely establish that the specific items seized were necessary for her continued work on the catalogue. Instead, the evidence cut in the opposite direction: by emphasizing that the catalogue encompasses "*all* of [Victor Vasarely's] work and the life of each work[,]" Mrs. Vasarely implicitly acknowledged that she has been able to make progress on the catalogue even with respect to artworks not in

her possession. (**ECF No. 105 at 33:22 − 34:1**). Her testimony thus left unexplained why she needed immediate possession of the specific artworks seized by the Government in order to continue her work. *Cf. Ramsden v. United States*, 2 F.3d 322, 325 (9th Cir. 1993) (holding that the movant demonstrated a need for the documents because they were "necessary for [him] to run his business"); *see also Trump v. United States*, 54 F.4th 689, 699 (11th Cir. 2022) ("Courts that have authorized equitable jurisdiction have emphasized the importance of identifying "specific" documents and explaining the harm from their "seizure and retention."); *see also Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th 593, 600 (5th Cir. 2021) (finding that petitioner had a "privacy need" where the petitioner identified of the specific privileged documents that the government seized); *Times Publ'g Co. v. United States*, 23-mc-0014, 2023 WL 7411463, at *6 (M.D. Fla. Sept. 22, 2023) (finding that the movant did not establish "need" for the property seized because he did not specifically identify the materials that he required).

It must be noted that the Government's need for the property to comply with its treaty obligations is more than de minimis. *Dolours Price I*, 685 F.3d at 18 (explaining that, in exchange for assuming treaty obligations, "this country is provided with valuable reciprocal rights" and concluding that "[t]he federal interest in cooperating in the criminal proceedings of friendly foreign nations is obvious.") (quotations omitted); *Ramsden*, 2 F.3d at 326−27 (noting that the Government's treaty obligation to turn the seized documents over to the British authorities constituted a legitimate law enforcement interest under Rule 41(g)); *Chaim v. U.S.,* 692 F. Supp. 2d 461, 475 (D.N.J. 2010) (finding that "while the [movant] has a clear interest in the use of the funds, the Government's interest [in their forfeiture] is not *de minimis*. This factor [thus] is neutral.").

Accordingly, the Court finds that this factor weighs in favor of the Government.[25]

### C. Irreparable Harm

The third *Richey* factor asks whether Mrs. Vasarely would be irreparably injured if the property is not returned to her. "Irreparable harm" generally refers to "a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross–Simons of Warwick v. Baccarat*, Inc., 102 F.3d 12, 19 (1st Cir.1996) (defining "irreparable harm" in the context of Rule 65 of the Federal Rules of Civil Procedure). It is therefore "usually enough if the plaintiff shows that its legal remedies are inadequate."[26] *Id.* (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)). In short, a Rule 41(g) movant must show that they "cannot wait for a legal remedy, thus justifying the court's equitable jurisdiction.'" *Times Publ'g Co. v. United States*, 23-mc-0014, 2023 WL 7411463, at *7 (M.D. Fla. Sept. 22, 2023) (quoting *Bennett v. United Sates*, 12-cv-61499, 2013 WL 3821625, at *14 (S.D. Fla. July 23, 2013)).[27]

There is no doubt that Mrs. Vasarely suffered a harm when 112 precious artworks were seized from her residence in San Juan. The question disputed by the parties,

---

[25]     As an alternative, Mrs. Vasarely suggests that the Court order that the artwork remain in the custody of the Museum of Art of Puerto Rico. (**ECF No. 143 at 11**). There, she argues, the Court would have continued jurisdiction over the property, both herself and the French officials could access it, and it would be under expert care during the pendency of the French proceedings. (**ECF No. 143 at 11-12**). In response, the Government points out that in order for the Court to tailor such "reasonable conditions," it first would need to decide to exercise its equitable jurisdiction. (**ECF No. 148 at 11**). Because the Government argues Mrs. Vasarely does not satisfy the *Richey* test, it maintains the Court cannot order the artwork remain in the custody of the proposed neutral third-party. (**ECF No. 142 at 37 ¶ 17-22**). The Court agrees. Because the Court declines to exercise its equitable jurisdiction, no such "reasonable conditions" may be imposed.

[26]     The Court notes that this factor is therefore largely co-extensive with the fourth prong of the *Richey* test, that is, whether Mrs. Vasarely has an adequate remedy at law for the harm she has allegedly suffered.

[27]     The parties have expended considerable effort debating the potential for irreparable injury to the property should it be returned to Mrs. Vasarely or shipped to France. However, "[f]or irreparable injury, courts focus on the harmful effects the loss of the property wreaks on the movant." *Times Publ'g Co. v. United States*, 23-mc-0014, 2023 WL 7411463, at *7 (M.D. Fla. Sept. 22, 2023) (citing *United States v. Search of L. Off., Residence, & Storage Unit Alan Brown*, 341 F.3d 404, 415 (5th Cir. 2003)) (emphasis added). Accordingly, the Court addresses only arguments pertaining to risk of irreparable harm to Mrs. Vasarely.

however, is whether that harm was "irreparable." In addressing this question, the Court will not anticipate the outcome of the ongoing French criminal proceedings against Mrs. Vasarely: whether she will be recognized the rightful owner of the artworks at the conclusion of that case is a question best left to the proceedings in France. The issue of "irreparable harm" therefore looks to the harm that may be inflicted upon Mrs. Vasarely if the artworks are not immediately returned to her possession during the pendency of the French proceedings.

Mrs. Vasarely maintains that she will be irreparably injured if the property is not immediately returned to her because, in light of her advanced age and fragile health, "[i]f the [a]rtwork is shipped to France . . . [she] would almost certainly never see it again regardless of the outcome of the French criminal case, due to the indefinite nature and duration of those proceedings." (**ECF No. 147 at 15**).[28] (**ECF No. 143 at 8-9**). In addition, Mrs. Vasarely raises concerns that her years-long project of developing the catalogue raisonné of Victor Vasarely will go unfinished if the artworks are not immediately returned to her possession, testifying that this work takes "hours, hours, [and] hours" and stating: "I know I am older. I have a short time, and I have to do it before I die." (**ECF No. 143 at 9**).

While the Court sympathizes with Mrs. Vasarely's advanced age, fragile health, and commitment to cataloging the artwork, this does not rise to the level of injury necessary to trigger the Court's equitable jurisdiction. Mrs. Vasarely has cited to no authority holding the potential length of a legal proceeding, when combined with a movant's advanced age, constitutes irreparable harm. Nor does the Court imagine such authority

---

[28]    The Government argues that the "French authorities have stated that she (and her counsel) will have access to the art for the preparation of her defense." (**ECF No. 148 at 10**).

exists. Even in the context of a United States proceeding, this argument would mean that any movant advanced in age would be entitled to the return of their property for fear the matter would outlive them. Unfortunately, the nature of civil and criminal proceedings can at times be lengthy, but this does not constitute irreparable harm. *See Home It, Inc. v. Wupin Wen*, 19cv-7070, 2019 WL 7168370, at *2 n.2 (E.D.N.Y. Dec. 23, 2019) (holding that the extended duration of legal proceedings does not alone establish irreparable harm); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir.2004) (noting that, "[i]n defining the contours of irreparable harm, the case law indicates that the injury must be both certain and great, and that it must not be merely serious or substantial"); *see also Chaim v. United States*, 692 F. Supp. 2d 461, 475 (D.N.J. 2010). This proposition becomes even thornier in the context of a MLAT request. As stated previously, the Court declines to pass judgment on the projected length of the French proceedings, as doing so would require an inquiry into every requesting state's legal system in the wake of an MLAT request.[29] Accordingly, the Court concludes that this factor weighs in favor of the Government.

### D. Adequate Remedy at Law

The final *Richey* factor asks whether – to the extent the Court declines to exercise equitable jurisdiction – an adequate remedy at law exists to vindicate Mrs. Vasarely's rights. *See Ramsden*, 2 F.3d at 326. The Government contends that the ongoing legal proceedings in France are the proper forum and provide her with "a plain, adequate, and complete remedy at law." (**ECF No. 144 at 13**). Mrs. Vasarely maintains that the French

---

[29]    The Court also notes that, according to the Government, the indefinite length of the French criminal proceedings is a direct result of actions taken by Mrs. Vasarely, who has not submitted herself to French jurisdiction on French soil to defend against the criminal allegations brought against her. (**ECF No. 180 at 2**).

proceedings do not present an adequate venue for the adjudication of her U.S. statutory and constitutional claims, and that a French tribunal will not address "whether the seizure contravened limits on U.S. seizure authority imposed by 18 U.S.C. § 3512." (**ECF No. 143 at 5**). Mrs. Vasarely sums up her argument by asking the Court: "if not you, then who?" *Id*. at 1.

For support Mrs. Vasarely cites to *Ramsden*, where the Ninth Circuit upheld the district court's decision to exercise its equitable jurisdiction. 2 F.3d 322 (9th Cir. 1993). In *Ramsden*, the court reasoned that because the Government did not plan to prosecute the movant, he would "not have the opportunity to challenge the seizure of the documents and request their return at a later date in a court in this country." *Id*. at 326 (emphasizing that, "because the search and seizure was conducted in the United States by government officials, both the public and [the movant] have an interest in seeing that he has an opportunity to vindicate his rights in this country"). To the extent that Mrs. Vasarely is arguing that she has no adequate remedy at law to challenge the constitutionality of the search and seizure, the French proceedings would indeed be inadequate. Put simply, the Fourth Amendment's prohibition against unreasonable search and seizures is not applicable in French criminal proceedings. *See Ramsden*, 2 F.3d at 326.

However, "[a]ll these arguments are a sideshow. The real question that guides our analysis is this—adequate remedy *for what*?" *Trump*, 54 F. 4th at 701 (emphasis in original). "If there is no constitutional violation—much less a serious one—then there is no harm to be remediated in the first place." *Trump v. United States*, 54 F.4th 689, 701 (11th Cir. 2022) (holding that the "foremost consideration" in determining whether a court should exercise its equitable jurisdiction is if the government callously disregarded

a movant's constitutional rights). As the Court previously noted, Mrs. Vasarely's constitutional rights were not violated in this case.

To the extent Mrs. Vasarely is arguing that she has no adequate remedy at law to determine her ownership of the artwork, the ongoing French proceedings are the appropriate forum for this determination. *Cf. United States v. Fed. Ins. Co.*, 23-cr-438, 2024 WL 1714273, at *2 (9th Cir. Apr. 22, 2024) (holding that, because the government "indicated it will not—indeed, it believes it cannot—initiate [a forfeiture proceeding]" there was no other adequate remedy at law for the movant to seek return of its property). Mrs. Vasarely has legal representation in France and is vigorously defending against the criminal charges she faces in that country. *See, e.g.*, (**ECF No. 149**). Moreover, the Court has no reason to believe that the French authorities will not return the artwork to her should she be determined the rightful owner. Indeed, as Mrs. Vasarely concedes in her motion, "the French authorities have stated that the [artwork] will [] be returned after a trial is held." (**ECF No. 1 at 39**). Accordingly, the Court finds that Mrs. Vasarely has an adequate remedy at law in France.

## V.    Conclusion

The Court declines to exercise equitable jurisdiction in this matter. As previously explained, Mrs. Vasarely's constitutional rights have not been subjected to callous disregard. Judicial intervention is therefore not justified. Furthermore, she has not demonstrated a sufficiently urgent need for her property, nor has she demonstrated that she will suffer irreparable harm should the property not be returned. Mrs. Vasarely also has an adequate remedy at law to advocate for her ownership rights over the artwork in France.

The issue presented by this petition – whether a federal court may in equity order the return of goods seized by the United States pursuant to its treaty obligations with a foreign sovereign – raises challenging and nuanced separation of powers issues. While extensive, the prerogatives of the Executive Branch in this realm are not unlimited. *See Dolours Price I*, 685 F.3d at 15 ("It is undisputed that treaty obligations are subject to some constitutional limits."). If the Executive Branch were, under the guise of its international obligations, to engage in a callous disregard of the fundamental rights guaranteed by our Constitution, this Court would not hesitate to exercise its equitable jurisdiction and intervene. *See Dolours Price II,* 718 F.3d at 22–23 (ruling that the federal courts retain the power to quash a subpoena issued under Section 3512, as a contrary holding would permit the "unacceptable conclusion that the executive branch [may] exercise judicial power") (quotations omitted); *see also In re Premises*, 634 F.3d at 572–73 (noting that, "if credible evidence demonstrated that compliance with a subpoena [under § 3512] would lead to an egregious violation of human rights, such as torture, then the Constitution may require the courts to deny assistance."); *cf. Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).

Yet judicial intervention is not warranted in this case. Here, Mrs. Vasarely has failed to demonstrate that her constitutional rights were violated, much less that her rights were met with the callous disregard of Government officials. The exercise of equitable jurisdiction in this case is therefore not warranted. Accordingly, the instant motion for return of seized property is **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of September, 2025.

<u>**s/ María Antongiorgi-Jordán**</u>
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**